UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

JANSSEN SCIENCES IRELAND UNLIMITED
COMPANY, et al.,
:
:
:                    Case No. 1:22-cv-01983-BMC
                          Plaintiffs,       :
:
v.                                          :
:
SAFE CHAIN SOLUTIONS, LLC, et al.          :
:
                          Defendants.       :

----------------------------------------------------------- x

## SECOND AMENDED COMPLAINT

Plaintiffs Janssen Sciences Ireland Unlimited Company, Janssen Products, LP, and

Johnson & Johnson (collectively "Janssen"), by and through their counsel, Patterson Belknap

Webb & Tyler LLP, for their First Amended Complaint against ProPharma Distribution LLC

("ProPharma"); Levi Ellis (together with ProPharma, the "ProPharma Defendants"); Scripts

Wholesale Inc. ("Scripts"); Steven Diamantstein, (together with Scripts, the "Scripts

Defendants"); I Care Pharmacy 14, Inc. ("I Care"); Edward Gendin (together with I Care, the "I

Care Defendants"); Cina Pharmaceutical Inc. ("Cina"); Tronown V. Thomas (together with Cina,

the "Cina Defendants"); Cintex Services LLC ("Cintex"); Roberto Rodriguez Hernandez

(together with Cintex, the "Cintex Defendants"); R&A Drugs, Inc. ("R&A"); Artur Ilaev; R&K

Drugs, Inc. ("R&K"); Raif Khasiev (together with R&A, Ilaev, and R&K the "Tremont Ave.

Defendants"); Brooklyn Chem, Corp. ("Brooklyn Chem"), Gulyamhusen Azimov, (together with

Brooklyn Chem, the "Brooklyn Chem Defendants," and together with the Tremont Ave.

Defendants, the "I Care Successors"); Ascan Pharmacy, Inc. ("Ascan"); Francis L. Fata (together

with Ascan, the "Ascan Defendants"); Everything Pharmacy Related II, Inc. d/b/a Total Remedy

and Prescription Center ("Total Remedy"), Mohammad Etminan (together with Total Remedy,

1

the "Total Remedy Defendants"); SRX Specialty Care Pharmacy ("SRX"); Aman Deep Singh (together with SRX, the "SRX Defendants"); TLC Xpress Pharmacy Inc., d/b/a TLC Xpress Pharmacy ("TLC Xpress"); and Kevin Nhathuy Quang Tran (together with TLC Xpress, the "TLC Xpress Defendants") allege as follows:

<u>**SUMMARY OF THE ACTION**</u>

1.      In this action, Janssen seeks to put an immediate and permanent stop to Defendants' dangerous sale of counterfeit Janssen-branded HIV and other medications in New York City and across the United States.

2.      Janssen has recently received a series of complaints from patients distressed to find that their prescribed bottles of SYMTUZA®, a lifesaving HIV medication that combines a complete multidrug HIV regimen in a single pill, contained the wrong pills inside the bottles.

3.      Extensive investigation by Janssen confirmed that these bottles were counterfeits.  The state-of-the-art process controls at Janssen's packaging plant make it impossible for genuine SYMTUZA® bottles to contain anything but SYMTUZA® pills.  Furthermore, the bottles bore other indications of counterfeiting, including fake labels, falsified instructions for use, and counterfeit supply-chain pedigrees.

4.      Patients who have been prescribed SYMTUZA® depend on the medication's complete multidrug regimen to control their viral loads and ultimately protect them from terminal disease.  But the pills found inside the counterfeit bottles were different drugs that do not adequately control these patients' viral loads and thus place them at serious risk of disease progression.

5.      Due to the rapidly mutating nature of HIV, missing all or part of a medication regimen can place patients at risk of developing drug resistance, which may persist

2

even after the proper drug regimen is restored.  As a result, counterfeit SYMTUZA® puts patients at risk of suffering permanent harm from disruption in treatment.

6.      Beyond these serious microbiological consequences, finding the wrong pill in a bottle of HIV medication can lead some members of the HIV-positive community to lose trust in the healthcare system and stop treatment altogether.  Indeed, one of the patients who received a counterfeit SYMTUZA® bottle and reported it to Janssen could not be located for follow-up monitoring, with their healthcare provider reporting that the patient had fallen out of care following the counterfeiting incident.

7.      Defendants have distributed counterfeit SYMTUZA® and other counterfeit Janssen medications on a large scale.

8.      **The Wholesaler Defendants.**  The ProPharma and Scripts Defendants, as well former Defendants Safe Chain Solutions, LLC ("Safe Chain"), Patrick Boyd, and Charles Boyd (together with Safe Chain, the "Safe Chain Former Defendants") are pharmaceutical wholesalers that have distributed large quantities of counterfeit Janssen HIV medication.  The Safe Chain Former Defendants, the ProPharma Defendants, and the Scripts Defendants are collectively referred to here as the "Wholesaler Defendants."  Several of the complaints of counterfeit SYMTUZA® with the wrong pills in the bottles could be traced to sales by Scripts or Safe Chain.  ProPharma disclosed to Janssen that it was in possession of hundreds of bottles of Janssen HIV medication that proved to be counterfeit.  And publicly available documents in *Gilead et al., v. Safe Chain Solutions LLC*, No. 21-cv-4106 (E.D.N.Y.) (the "Gilead Action") reveal that the counterfeits Janssen was notified about represent only a small fraction of the Wholesaler Defendants' counterfeiting activities.

3

9.      **I Care and its Successors**.  Meanwhile, Janssen continued to receive complaints of counterfeit SYMTUZA® including separate incidents in New York City in late December 2021 and January 2022.  One of these complaints concerned a bottle dispensed by Defendant I Care, a Manhattan pharmacy that is not involved in the Gilead litigation.

10.      Immediately after the counterfeit was discovered, I Care abruptly closed its doors in an obvious effort to stay one step ahead of the law.  Janssen's investigation subsequently revealed that I Care, beginning in April 2021, had arisen from nowhere to become one of the largest sellers of Janssen HIV medication in New York City by the time it was discovered selling counterfeits in late December 2021.  Then, days after I Care shut down, a Queens pharmacy, Defendant Brooklyn Chem, abruptly took over I Care's HIV business.

11.      Pursuant to an *ex parte* seizure order issued by this Court, Janssen conducted a seizure at the residence of Defendant Edward Gendin, I Care's principal.  The seizure confirmed that I Care had abruptly sold its entire business to Brooklyn Chem, through Brooklyn Chem's principal, Defendant Gulyamhusen Azimov.  Gendin subsequently exercised his Fifth Amendment rights against self-incrimination in response to all questions about I Care's business.  Following the I Care seizure, Brooklyn Chem closed its doors and Azimov appears to have absconded.

12.      In addition to Brooklyn Chem, Defendants R&A and R&K, two drugstores sharing the same address that are referred to here, together with their principals, as the Tremont Ave. Defendants, have followed I Care's and Brooklyn Chem's model, emerging from nowhere to purchase large quantities of HIV medication for no apparent legitimate reason, then suddenly closing down immediately after the I Care seizure.

4

13.     The evidence indicates that I Care, Brooklyn Chem, and the Tremont Ave. Defendants are connected to a criminal counterfeiting ring that has been dispensing dangerous counterfeit HIV medication in New York City.

14.     **Cina.**  After this action was filed, Janssen traced another complaint about a wrong-pill counterfeit in New York City to a different source: Cina, a Houston-Texas based pharmaceutical distributor.  Third-party discovery revealed that Cina shipped dozens of packages per day to pharmacies throughout the United States, including to Defendant Ascan, a Queens-based pharmacy.  Defendant Ascan had previously bought hundreds of counterfeits from the Wholesaler Defendants, but had more recently started buying from Cina.

15.     Pursuant to an order issued by this Court, Janssen conducted an *ex parte* seizure at Cina's headquarters.  The seizure confirmed that Cina sold millions of dollars' worth of infringing Janssen-branded medication to customers around the country.  These products were obtained for pennies on the dollar from unlicensed suppliers operating out of maildrops and private residences, and were sold without accompanying supply-chain pedigrees or any other documentation of their provenance or authenticity, in violation of the Drug Supply Chain Security Act, 21 U.S.C. §§ 360eee *et seq.*.  Defendant Tronown V. Thomas, the president and sole owner of Cina, personally negotiated the purchases of Janssen-branded medications from these suppliers and personally signed invoices for sales of the medications.  At a deposition, Thomas exercised his Fifth Amendment rights against self-incrimination in response to all questions about Cina's purchases and sales of Janssen-branded medication.

16.     Cina's prescription-drug business continued unabated for two months after Thomas was indicted for healthcare fraud in April 2022.  But discovery has revealed that Cina abruptly exited the prescription-drug business on June 30, 2022, and donated its entire

prescription-drug inventory to a relief organization, in an apparent effort to escape liability for its wrongdoing.  None of the Janssen-branded products Cina donated had any pedigrees, and several have been confirmed to be counterfeit.

17.     **Cintex**.  Janssen has also discovered that Defendant Cintex supplied over 2,500 bottles of counterfeit Janssen-branded HIV medication to Safe Chain.  Discovery has shown that Cintex is a fly-by-night operation that closely matches the template of early suppliers of counterfeit HIV medication to the Wholesaler Defendants.  For example, Cintex (like other suppliers of counterfeits) operates from a mail-drop location and has misappropriated the name of a legitimate pharmaceutical business in an effort to deceive its downstream customers.

18.     **The Pharmacy Customer Defendants**.  Defendants Ascan, Total Remedy, SRX, and TLC Xpress (together with their principals, the "Pharmacy Customer Defendants") are pharmacies that purchased high volumes of counterfeit Janssen-branded HIV medication from the Wholesaler Defendants and dispensed them to patients.  Discovery has shown that even after the Wholesaler Defendants stopped distributing HIV medication, these pharmacies have continued to dispense Janssen-branded medication of unknown origin and pedigree to their unsuspecting patients.

19.     Janssen brings this action to put a stop to Defendants' distribution of counterfeit HIV medication and to protect HIV-positive patients in New York City and throughout the country from the perils of these dangerous counterfeits.

## THE PARTIES

**A.     PLAINTIFFS**

20.     Plaintiff Johnson & Johnson is a public corporation organized under the laws of the State of New Jersey.  Its principal place of business is One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.  Johnson & Johnson is a multinational holding company for

14053344

companies with a primary focus of providing products and services related to human health and well-being. Johnson & Johnson is also the owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine HIV and other medications, including the EDURANT®, SIMPONI®, INVOKAMET®, INVOKAMET XR®, JANSSEN®, and janssen𝓙 marks.

21.     Plaintiff Janssen Products, LP ("JPLP") is a limited partnership organized under the laws of the State of New Jersey. Its principal place of business is 800 Ridgeview Dr, Horsham, PA 19044. Janssen Products, LP is an indirect subsidiary of Johnson & Johnson and markets lifesaving medications in the United States, including SYMTUZA®, PREZCOBIX®, PREZISTA®, and EDURANT®.

22.     Plaintiff Janssen Sciences Ireland Unlimited Company ("Janssen Ireland") is a private unlimited company organized under the laws of Ireland. Its principal place of business is Airton Road, Dublin, Ireland D24WR89. Johnson & Johnson is the ultimate parent of Janssen Ireland. Janssen Ireland is the owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine HIV and other medications, including SYMTUZA®, PREZCOBIX®, PREZISTA®, and INTELENCE®.

**B.     ORIGINAL DEFENDANTS**

**1.     Safe Chain Former Defendants**

23.     Former Defendant Safe Chain Solutions, LLC ("Safe Chain") is a Delaware limited liability corporation with a principal place of business in Cambridge, Maryland.

24.     Former Defendant Patrick Boyd is an individual residing in Maryland. Together with his brother Charles, Patrick Boyd is a founder, owner, and managing principal of

7

Safe Chain.  Patrick Boyd managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit HIV and other medications.  Patrick Boyd directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

25.     Former Defendant Charles Boyd is an individual residing in Maryland. Together with his brother Patrick, Charles Boyd is a founder, owner, and managing principal of Safe Chain.  Charles Boyd serves as CEO of Safe Chain.  Charles Boyd managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit HIV and other medications.  Charles Boyd directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

26.     The Safe Chain Former Defendants have entered into a consent judgment and permanent injunction and are no longer Defendants in this action.

### 2.     ProPharma Defendants

27.     Defendant ProPharma Distribution LLC ("ProPharma") is a Colorado limited-liability corporation with a principal place of business in Colorado.

28.     Defendant Levi Ellis is an individual residing in Colorado.  Ellis is the founder and owner of ProPharma.  Ellis managed, supervised, ratified, and/or personally participated in the trafficking of counterfeit HIV medications.  Ellis directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

### 3.     Scripts Defendants

29.     Defendant Scripts Wholesale Inc. ("Scripts") is a New York corporation with a principal place of business in New York.  Its principal is Defendant Steven Diamantstein. Scripts is a brick-and-mortar distributor that sells counterfeit HIV medication.

30.     Defendant Steven Diamantstein is an individual residing in Brooklyn, New York.  Diamantstein is the principal of Scripts.  Diamantstein supervised, ratified, and/or

personally participated in the trafficking of counterfeit HIV medications.  Diamantstein directly

financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

     **4.**     **I Care Defendants**

     31.     Defendant I Care Pharmacy 14, Inc. ("I Care") is a New York corporation

with a listed corporate address in Queens, New York.  Its principal is Defendant Edward Gendin.

Until just recently, I Care Pharmacy 14, Inc. operated a brick-and-mortar pharmacy at 223 W

14th Street, New York, New York 10011.  This location was abruptly abandoned upon being

found with counterfeits.

     32.     Defendant Edward Gendin is an individual residing in Hewlett, New York.

Gendin is the principal of I Care Pharmacy 14, Inc.  Gendin supervised, ratified, and/or

personally participated in the trafficking of counterfeit HIV medications.  Gendin directly

financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

**C.**     **NEW DEFENDANTS NAMED IN FIRST AMENDED COMPLAINT**

     **1.**     **Cina Defendants**

     33.     Defendant Cina Pharmaceutical, Inc. ("Cina") is a Texas corporation with

a listed corporate address in Houston, TX.  Its principal is Tronown V. Thomas.  Cina is a

wholesale pharmaceutical distributor with active wholesale distributor licenses in Arkansas,

Colorado, Connecticut, Illinois, Kentucky, Louisiana, New Jersey, New York, North Carolina,

Ohio, Oklahoma, Texas, Virginia, Washington and West Virginia.  Cina supplied millions of

dollars' worth of Janssen-branded medication to many pharmacies around the nation, and was

the source for a bottle of SYMTUZA® with the wrong pills in the bottles and no pedigree that

was recently dispensed by a pharmacy in the Bronx.

     34.     Defendant Tronown V. Thomas is a pharmacist residing in Texas.  He is

the principal of Cina.  Thomas supervised, ratified, and personally participated in the trafficking

9

of counterfeit Janssen-branded medications.  Thomas directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.  Thomas was recently indicted for Conspiracy to Pay and Receive Healthcare Kickbacks, Healthcare Fraud, and Conspiracy to Launder Money related to a scheme in Texas federal court.  *See United States v. Thomas*, No. 22-cr-212 (S.D. Tex. Apr. 27, 2022) (D.I. 1).  At his deposition in this case, Thomas exercised his Fifth Amendment rights against self-incrimination in response to all questions regarding Cina's purchase and sale of Janssen-branded products and his own involvement in those activities.

### 2.    Cintex Defendants

35.    Defendant Cintex Services LLC ("Cintex") is a limited liability company formed in Illinois.  It lists its contact address in business records as 1500 N. Halsted St., Suite 202, Chicago, IL.  Its principal is Roberto Rodriguez Hernandez.  Cintex supplied Safe Chain with a large volume of counterfeit Janssen HIV medication, which Safe Chain sold to various pharmacies, including many in New York, who dispensed the counterfeits to patients.  Cintex also misappropriated the name of a legitimate business in the pharmaceutical industry—to which it has no connection—to lend a false veneer of legitimacy to its business.

36.    Defendant Roberto Rodriguez Hernandez is an individual residing in Florida.  He is the principal of record of Cintex.  Hernandez supervised, ratified, and/or personally participated in the trafficking of counterfeit HIV medications.  Hernandez directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

### 3.    I Care Successors

### a.    Brooklyn Chem Defendants

37.    Defendant Brooklyn Chem, Corp. ("Brooklyn Chem") is a New York corporation that operated a pharmacy in Jackson Heights, NY.  Brooklyn Chem's principal is

Gulyamhusen Azimov.  Brooklyn Chem acquired the assets of I Care shortly after I Care's

counterfeiting scheme was detected, assumed "I Care Pharmacy 14" as a business name, and

stepped into I Care's shoes in ordering large quantities of Janssen HIV medication.

38.     Defendant Gulyamhusen Azimov is an individual residing in New York.

He is the principal of Brooklyn Chem.  Azimov directly financially benefitted from the

counterfeiting and had the ability to stop it, but did not do so.

### b.     Tremont Ave. Defendants

39.     Defendant R&A Drugs, Inc. ("R&A") is a New York corporation with its

principal place of business at 2562 Tremont Avenue in the Bronx, NY.  Its principal is Artur

Ilaev.  R&A supplies wholesalers, including Scripts (who is based in Brooklyn), with HIV

medication and also operates a retail pharmacy in the Bronx.  R&A has participated in the

trafficking of counterfeit Janssen-branded HIV medication.

40.     Defendant Artur Ilaev is an individual residing in New York.  He is the

principal of R&A.  Ilaev supervised, ratified, and/or personally participated in the trafficking of

counterfeit HIV medications.  Ilaev directly financially benefitted from the counterfeiting and

had the ability to stop it, but did not do so.

41.     Defendants R&K Drugs, Inc. ("R&K") is a New York corporation with its

principal place of business at 2562 Tremont Avenue in the Bronx, NY.  Its principal is Raif

Khasiev.  R&K has participated in the trafficking of counterfeit Janssen-branded HIV

medication.

42.     Defendant Raif Khasiev is an individual residing in New York.  He is the

principal of R&K.  Khasiev supervised, ratified, and/or personally participated in the trafficking

of counterfeit HIV medications.  Khasiev directly financially benefitted from the counterfeiting

and had the ability to stop it, but did not do so.

11

### 4.     Pharmacy Customer Defendants

#### a.     Ascan Defendants

43.     Defendant Ascan Pharmacy, Inc. ("Ascan") is a New York corporation that operates a pharmacy in Forest Hills, NY.  Ascan's principal is Francis L. Fata.  In November 2020, Ascan sold a wrong-pill counterfeit to a customer, which it had purchased from Scripts, a Brooklyn wholesaler.  This counterfeit bottle was labeled and sold as SYMTUZA® but actually contained PREZCOBIX®.

44.     Even after discovering the counterfeit in November 2020, Ascan continued to purchase hundreds of bottles of counterfeit Janssen-branded HIV medication from Safe Chain, Scripts, and ProPharma.  Ascan obtained medication from Defendant Cina.

45.     Defendant Francis L. Fata is an individual residing in New York.  He is the principal of Ascan.  He directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

#### b.     Total Remedy Defendants

46.     Everything Pharmacy Related II, Inc. d/b/a Total Remedy and Prescription Center ("Total Remedy") is a California corporation that operates a pharmacy in Los Angeles, CA.  Total Remedy's principal is Mohammad Etminan.  Total Remedy purchased thousands of units of counterfeit Janssen-branded HIV medication from Scripts, Safe Chain, and ProPharma, including over a thousand bottles from Brooklyn-based Scripts.  Since the Wholesaler Defendants stopped selling HIV medication, Total Remedy has been obtaining Janssen-branded HIV medication of unknown origin from unidentified unauthorized distributors.

47.     Defendant Mohammad Reza Etminan is an individual residing in California.  He is the principal of Total Remedy.  Etminan directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

14053344

### c.       SRX Defendants

48.       Singh RX, PLLC d/b/a SRX Specialty Care Pharmacy ("SRX") is a Michigan professional limited liability company.  SRX operates a pharmacy in Royal Oak, MI. Its principal is Aman Deep Singh.  SRX bought hundreds of counterfeit bottles from Safe Chain and Brooklyn-based Scripts, long after a counterfeit SRX purchased from Safe Chain and dispensed to a customer was detected and brought to SRX's attention.  Since the Wholesaler Defendants stopped selling HIV medication, SRX has been obtaining Janssen-branded HIV medication of unknown origin from unidentified unauthorized distributors.

49.       Defendant Aman Deep Singh is an individual pharmacist residing in Michigan.  He is the principal of SRX.  He directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

### d.       TLC Xpress Defendants

50.       Defendant TLC Xpress Pharmacy Inc., d/b/a TLC Xpress Pharmacy ("TLC Xpress") is a California incorporation.  It operates a pharmacy in Fountain Valley, California.  Its principal is Kevin Nhathuy Quang Tran.  TLC Xpress bought hundreds of counterfeit bottles from ProPharma, Safe Chain, and Brooklyn-based Scripts.  Since the Wholesaler Defendants stopped selling HIV medication, TLX Xpress has been obtaining Janssen-branded HIV medication of unknown origin from unidentified unauthorized distributors.

51.       Defendant Kevin Nhathuy Quang Tran is an individual residing in California.  He is the principal of TLC Xpress.  He directly financially benefitted from the counterfeiting and had the ability to stop it, but did not do so.

## JURISDICTION AND VENUE

52.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 1121(a), 1331, 1338, and 1367 and general principles of ancillary and pendent jurisdiction.

53.     The Court has personal jurisdiction over each of the Defendants because each of the Defendants has sufficient minimum contacts with New York and with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

54.     The Scripts Defendants, the I Care Defendants, the Brooklyn Chem Defendants, and the Ascan Defendants are located in this district and their principals reside in this district.  They each sold counterfeit Janssen-branded HIV medication in New York City and to New York City pharmacies and patients.

55.     ProPharma, through its principal Ellis, advertises that it sells pharmaceutical products throughout the United States, maintains active licensure in New York as an out-of-state pharmaceutical wholesaler for the purpose of selling pharmaceutical products in New York, and has sold counterfeit HIV products into New York, including Janssen-branded HIV medication.  The ProPharma Defendants have previously consented to personal jurisdiction and venue in this district.

56.     The Cina Defendants sold counterfeit Janssen-branded HIV medication to many pharmacies in the New York City area, including pharmacies in this district.  The Cina Defendants maintained active licensure in New York as an out-of-state pharmaceutical wholesaler for the purpose of selling pharmaceutical products into New York.  Janssen has already detected one instance of Cina supplying a counterfeit bottle labeled SYMTUZA® that contained the wrong pills to a pharmacy in the Bronx, which dispensed the bottle to a patient.

14

14053344

Cina further supplied counterfeit and infringing bottles of SYMTUZA® to Defendant Ascan, who is based in Queens.  Additionally, the Cina Defendants have consented to personal jurisdiction and venue in this district.  Thomas personally participated in the purchase of counterfeit Janssen-branded medication that were sold in this district and the sale of counterfeit Janssen-branded medication in this district.

57.     The Cintex Defendants supplied Safe Chain with a large volume of counterfeit Janssen-branded HIV medication.  They knew that much of this medication would be sold in New York and conspired with Safe Chain to sell counterfeit Janssen-branded HIV medication in New York.  Based on their distinctive business practices, Cintex Defendants also conspired with numerous other unknown individual and entities to sell counterfeit Janssen-branded HIV medication in New York and to undertake business activities in New York related to their counterfeiting.

58.     The Tremont Ave. Defendants sold counterfeit Janssen-branded HIV medication in New York City, including to Scripts, a Brooklyn-based distributor.

59.     The Total Remedy Defendants, the SRX Defendants, and the TLC Xpress Defendants have regularly transacted business within New York by purchasing large quantities of counterfeit Janssen-branded HIV medication from Scripts, a Brooklyn distributor, in a series of transactions over an extended period of time, and sending payments for these counterfeits into Brooklyn.

60.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because, as alleged above, multiple Defendants are located in this district, multiple Defendants reside in this district, multiple Defendants have their principal place of business in this district, multiple Defendants sold counterfeit products into this district, multiple Defendants purchased

15

counterfeit products from distributors in this district, multiple Defendants conspired to operate a counterfeiting enterprise that sold counterfeit products into this district, and a substantial part of the events giving rise to Janssen's claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.   JANSSEN'S HIV MEDICATIONS

61.   The Janssen HIV medications at issue in this case are groundbreaking treatments based on the protease inhibitor darunavir, which was developed by Janssen in the late 1990s and early 2000s to combat multi-resistant forms of HIV that could not be adequately treated with earlier HIV medications.

62.   Like all antiretrovirals, darunavir should be administered in combination with other antiretroviral agents to achieve a complete combination antiretroviral therapy for HIV.

63.   PREZISTA® is the original darunavir medication – its only active ingredient is darunavir.  To provide a complete treatment regimen against HIV, PREZISTA® must be administered with at least two other medications:  (1) a "booster" for darunavir that inhibits a liver enzyme that would otherwise metabolize darunavir (usually ritonavir or cobicistat); and (2) at least one other antiretroviral agent from a different class of drugs, such as integrase inhibitors (INI) or nucleoside reverse transcriptase inhibitors (NRTI).  Patients prescribed PREZISTA® must therefore take at least three drugs a day – PREZISTA® and two others – to complete their HIV treatment regimen.

64.   PREZCOBIX® is a fixed-dose combination medication that combines darunavir with the CYP3A inhibitor cobicistat, which acts as a booster for darunavir and eliminates the need for separate administration of a booster.  But PREZCOBIX® is not a complete HIV regimen. A person prescribed PREZCOBIX® as part of their HIV treatment regimen must take at least one other antiretroviral medication.

14053344

65.     SYMTUZA® is a complete, single-tablet, once-a-day medication that contains an entire HIV combination therapy regimen in a single pill.  SYMTUZA® contains the boosted darunavir combination found in PREZCOBIX® (darunavir and cobicistat), as well as two other drugs (emtricitabine and tenofovir alafenamide)  A patient prescribed SYMTUZA® receives their entire HIV combination treatment (i.e., "a complete regimen") in one daily pill.

66.     EDURANT® and INTELENCE®  are HIV medications that are also used to treat HIV as part of combination antiretroviral therapy.

67.     Janssen's HIV medications do not cure HIV.  But when as prescribed (and, except in the case of SYMTUZA®, in combination with other medications), they can lower the amount of virus in a patient's blood to undetectable levels.

**B.     JANSSEN'S TRADEMARKS**

68.     Plaintiffs own several different registered, well-known trademarks that appear on the packaging of genuine Janssen HIV medications and other Janssen medications.

69.     Janssen Sciences Ireland Unlimited Company owns the SYMTUZA®, PREZCOBIX®, PREZISTA®, INTELENCE®, and INTELENCE  marks (the "Janssen Ireland Marks").

70.     Johnson & Johnson owns the EDURANT®, SIMPONI®, INVOKAMET®, INVOKAMET XR®, JANSSEN®, and janssen  marks (the "Johnson & Johnson Marks").

71.     Janssen and its affiliates have used and are currently using the Janssen Ireland Marks and Johnson & Johnson Marks in commerce in connection with its sale of the above-described medications, and plans to continue such use in the future.  Janssen and its affiliates prominently display the Janssen Ireland Marks and Johnson & Johnson Marks in their advertising and promotional materials.

17

C.      **DEFENDANTS' COUNTERFEIT JANSSEN MEDICATIONS**

72.      Janssen has recently learned that Defendants and others have been distributing counterfeit Janssen-branded medication in the United States.

73.      Janssen learned of Defendants' counterfeits through multiple sources including:  (1) complaints of counterfeit Janssen HIV medication from pharmacists and patients; (2) the return of hundreds of bottles of counterfeit medicine by Defendant ProPharma; (3) the disclosure of widespread distribution of purported Janssen product by known counterfeiters in litigation brought by another manufacturer of HIV medication, Gilead Sciences, Inc. ("Gilead"); (4) Janssen's investigations of suspicious business practices by New York City-based pharmacies; and (5) discovery Janssen has obtained in this action.

1.      **Complaints of Counterfeit Janssen HIV Medication**

74.      Beginning in November 2020 and continuing to the present, Janssen has investigated a continual series of complaints concerning counterfeit Janssen HIV medication.

75.      Janssen has conducted its own investigation into the complaints and has also cooperated in an investigation conducted by the Food and Drug Administration's Office of Criminal Investigations.

76.      In the course of Janssen's investigation, Janssen has obtained several of the reported counterfeit bottles that contain the wrong medication and has confirmed through internal testing that the labels and instructions for use are, in many cases, also counterfeit.

77.      Janssen also undertook an extensive process analysis to determine whether the mislabeling could have occurred through an error in the original manufacturing or packaging process.  This analysis concluded that it was not possible that wrong pills could have been inadvertently placed in the bottle due to a manufacturing or bottling error.

18

78.     Rather, the counterfeit bottles with the wrong pills inside are the work of criminal counterfeiters.

### a.     The Ascan Complaint

79.     In November 2020, Janssen received a complaint that a bottle labeled and sold as SYMTUZA® by Defendant Ascan in Queens, New York contained only PREZCOBIX® tablets.

80.     The pharmacist reporting the counterfeit bottle sold at Ascan retained the counterfeit bottle and sent it to Janssen, who evaluated the sample for authenticity. Janssen's evaluation determined that the sample was counterfeit.

81.     This conclusion was reached because the label did not contain the security features present on genuine labels of SYMTUZA®,  the bottle did not contain a desiccant pouch (necessary to prevent moisture from degrading the medication), and the patient Instructions for Use was not the correct version for medication with the lot and serial number displayed on the label.

82.     Janssen also confirmed that the tablets contained in the sample were PREZCOBIX®, not SYMTUZA®.

83.     Janssen learned from the pharmacist that Ascan obtained the medication from Defendant Scripts. Janssen reported this information to the Food and Drug Administration's Office of Criminal Investigations.

84.     Defendant Scripts has acknowledged that it was subject to an FDA OCI inquiry about counterfeit SYMTUZA® and has confirmed that Ascan purchased counterfeit SYMTUZA® from Scripts.

19

b.     **The Quick-Med Pharmacy Complaint**

85.     In December 2020, Janssen received a complaint from Quick-Med Pharmacy in Asbury Park, New Jersey that was nearly identical to the complaint from Ascan Pharmacy: PREZCOBIX® pills inside a bottle labeled SYMTUZA®.

86.     Notably, the suspect bottles from Ascan and Quick-Med, reported by different pharmacies, purported to come from the same lot, and, importantly, bore the same serial number.  This is a  clear indicator of counterfeiting because each authentic SYMTUZA® bottle is given a unique serial number.

87.     The bottle labeled SYMTUZA® dispensed by Quick-Med Pharmacy was confirmed to be counterfeit.

88.     Quick-Med Pharmacy provided Janssen with an invoice for the counterfeit SYMTUZA® showing that the product had been purchased from Defendant Safe Chain.

c.     **The Navarro Pharmacy Complaints**

89.     In December 2020, Janssen received the first of several complaints arising out of Navarro / CVS Specialty Pharmacy ("Navarro") in Miami.

90.     The complaint was nearly identical to the previous complaints from New York and New Jersey—PREZCOBIX® tablets in bottles sold as SYMTUZA®.  That bottle purported to be from the same lot as the previous counterfeits, and also included the identical falsified serial number.

91.     In 2021, Janssen would receive two additional complaints from Navarro. The first of these was identical to the previous three: PREZCOBIX® tablets in bottles sold as SYMTUZA®, with the same lot number, and the same replication of the identical serial number.

14053344

92.     The second complaint was a bottle labeled as PREZCOBIX®.  That bottle did not contain HIV medication at all, and was instead filled with high-dose tablets of SEROQUEL XR (400 mg), a powerful antipsychotic, which is not manufactured by Janssen.

**d.     The SRX Complaint**

93.     In June 2021, Janssen received another complaint of a SYMTUZA® bottle containing PREZCOBIX®.  That bottle was dispensed by Defendant SRX in Michigan.

94.     Janssen's investigation into this complaint revealed that the patient had taken the incorrect PREZCOBIX® pills for nearly a month, potentially jeopardizing their health.

95.     Janssen's analysis of this sample concluded that it was an authentic SYMTUZA® bottle containing PREZCOBIX® pills, and therefore a counterfeit product.

96.     For this sample, the pharmacists provided Janssen with the supply-chain pedigree document for the counterfeit.  The pedigree had been provided to the pharmacy by Defendant Safe Chain.  According to the pedigree, SRX purchased the counterfeit from Safe Chain, which in turn had purchased it from Cintex, which in turn had purchased it from Janssen.

97.     Janssen determined that the pedigree was counterfeit.  The pedigree identified a purported direct sale from Janssen to Cintex, which is not a Janssen authorized distributor and thus could not have purchased the product directly from Janssen.

**e.     The I Care Complaint**

98.     On December 20, 2021, Janssen received a complaint from a patient that Defendant I-Care dispensed to him a bottle of SYMTUZA® that actually contained PREZCOBIX® tablets.

99.     Janssen confirmed that the tablets inside the bottle were PREZCOBIX®, not SYMTUZA®.

21

100.     As alleged below, Janssen's investigation of the I Care complaint indicates that I Care was part of a sophisticated counterfeiting operation that involved multiple additional New York City-based pharmacies.

**f.      The Morris Park Complaint**

101.     On January 14, 2022, Janssen received an additional complaint from New York City of another patient who had received PREZCOBIX® in a SYMTUZA® bottle.  This complaint related to a bottle dispensed at Morris Park Pharmacy in the Bronx.

102.     As alleged below, third-party discovery in this case has revealed that Cina was the source of the counterfeit medication sold at Morris Park Pharmacy.

**2.      ProPharma Inquiry and Return**

103.     During the course of Janssen's investigations, Defendant ProPharma contacted Janssen in August 2021 to inquire about the legitimacy of Janssen HIV medication in its possession.

104.     At the time of the inquiry, ProPharma stated that its inquiry was prompted by "due diligence."  Janssen subsequently learned that ProPharma reached out to Janssen only after Gilead conducted a Court-ordered seizure at ProPharma's warehouse.  During that seizure ProPharma was found with hundreds of bottles of counterfeit Gilead-branded HIV medication.

105.     ProPharma provided supply-chain pedigrees for some of the Janssen medication in its possession.  Every single supply-chain pedigree provided by ProPharma was counterfeit.  Specifically, ProPharma's pedigrees listed fraudulent sales that never occurred.

106.     After being informed that the pedigrees were false, ProPharma returned 247 bottles of Janssen HIV medication to Janssen, representing 32 different lot numbers.

22

107.    Janssen's investigation has revealed that in addition to bearing false pedigrees, most of the bottles received from ProPharma, including at least one sample from every one of the 32 lot numbers, bore counterfeit instructions for use.

**3.    Disclosure of the Widespread Distribution of Counterfeit HIV Medication by the Gilead Action**

108.    Recently unsealed documents from the Gilead Action reveal that the Safe Chain, Scripts, and ProPharma Defendants have distributed Gilead and Janssen HIV medication on a large scale throughout the country.  These documents also demonstrate that these Defendants' sale of counterfeits was willful.

**a.   The Safe Chain Defendants**

109.    Documents filed in the Gilead Action indicate that the Safe Chain Defendants sold many millions of dollars' worth of counterfeit HIV medication, all of which was accompanied by counterfeit pedigrees and much of which had counterfeit instructions for use, counterfeit bottle caps, or the wrong pills inside the bottles.

110.    Business records filed by Safe Chain in the Gilead Action document that Safe Chain sold millions of dollars of Janssen HIV medication – not just SYMTUZA® but also four other products: PREZISTA®, PREZCOBIX®, EDURANT®, and INTELENCE®.

111.    The public docket in the Gilead action also shows that concurrent with Janssen's investigation, Gilead confronted Safe Chain over its sale of counterfeit Gilead HIV medication.

112.    On May 4, 2020, Safe Chain represented to Gilead that it had ceased buying Gilead medication from the supplier of the counterfeits and was now buying Gilead HIV medication solely from a new seller who sourced the product directly from a Gilead-authorized distributor, so that there was no question the product was legitimate.  But just hours before Safe

23

Chain was making those representations to Gilead, the man who introduced that supplier to Safe

Chain told Safe Chain's owner, in writing, that "all of their shit is counterfeit."

113.    Safe Chain's Director of Compliance stated in writing that the new

supplier had provided a "fake pedigree," and directly warned Safe Chain's owners that the

supplier was using a fraudulent email address meant to mimic the email address of one of

Gilead's authorized suppliers..

114.    Despite being warned by its Director of Compliance and directly told by

its business partner that this supplier was selling counterfeit HIV medication, Safe Chain went on

to purchase millions of dollars of counterfeit Gilead HIV medication from that supplier.

**b. The Scripts Defendants**

115.    Documents filed in the Gilead Action indicate that the Scripts Defendants

sold many millions of dollars' worth of counterfeit HIV medication, all of which was

accompanied by counterfeit pedigrees and much of which had counterfeit instructions for use,

counterfeit bottle caps, or the wrong pills inside the bottles.  These counterfeits included large

quantities of Janssen HIV medication.

116.    Documents from the Gilead Action reveal that in 2019, the principals of a

Scripts distributor, Mainspring Distribution LLC ("Mainspring"), were indicted and

subsequently convicted for running a "black market" pharmaceutical counterfeiting scheme that

"specialized in expensive name-brand prescription drugs used to treat HIV."  One of

Mainspring's principals confessed that his operation would "re-label bottles of drugs for

something more expensive, or a bottle of drugs would contain 'candy' instead of medication."

117.    Scripts was informed of the Mainspring indictment.  Even after being so

informed, Scripts continued to sell counterfeit HIV medication that it had received from

Mainspring – including counterfeit Janssen HIV medication.

118.    When confronted about this decision during a deposition taken by Gilead, Scripts' owner, Defendant Steven Diamantstein, testified: "Well, I didn't know how much of that was illegal or not illegal … And at that point it's innocent until proven guilty, and I don't believe I had an obligation to let the drugs sit around."

### c. The ProPharma Defendants

119.    Documents filed in the Gilead Action indicate that the ProPharma Defendants sold many millions of dollars' worth of counterfeit HIV medication, all of which was accompanied by counterfeit pedigrees and much of which had counterfeit instructions for use, counterfeit bottle caps, or the wrong pills inside the bottles.  These counterfeits included large quantities of Janssen HIV medication.

120.    Documents from the Gilead Action show that ProPharma was part of the same counterfeiting network as Safe Chain and Scripts, including sharing the same fly-by-night counterfeit suppliers.  For example, the evidence in the Gilead Action shows that ProPharma began selling counterfeit HIV medications after being told by organizers of the counterfeiting ring that its "two major competitors" were already selling millions of dollars' worth of purported HIV medication weekly: "Safechain is moving about $5M a week and Scripps [*sic*] is around $8M."

### 4.    The Counterfeiting Operations at New York City Pharmacies

121.    Janssen's investigation into the complaint stemming from I Care Pharmacy revealed a pattern of activity that indicates a broader counterfeiting operation by that pharmacy and its owner, as well as its *de facto* successor, Brooklyn Chem, and at least one additional group of New York City-based pharmacies, the Tremont Ave. Defendants.

25

14053344

### a.   I Care

122.   I Care was incorporated by Rina Esterov, the same agent that incorporated entities for known members of the counterfeiting ring revealed by the Gilead Action.

123.   Prior to April 2021, I Care had never ordered genuine Janssen HIV medication from a Janssen-authorized distributor.  Then, from April to December 2021, I Care received 84 bottles of Janssen HIV medication from authorized distributors—placing I Care in the top 10% of pharmacies in New York City in volume of Janssen HIV medication received. This sudden increase in volume for a specialty medication is highly unusual.

124.   Janssen has confirmed that no products bearing the lot number or serial number of the counterfeit product sold by I Care were ever shipped to the authorized distributor from whom I Care purchased medication, indicating that the counterfeit did not come from that distributor. Despite its large volume of authorized purchases, in other words, I Care was dispensing HIV medication it had obtained somewhere else.

125.   This pattern—anomalously large purchases of authorized product by pharmacies that dispense counterfeits—is consistent with a known practice among certain pharmacies in New York City.  These pharmacies knowingly dispense counterfeit medication, purchase equivalent quantities from authorized distributors to avoid detection by auditors and law enforcement, and then resell the medication purchased from authorized distributors at substantial profit.

126.   I Care's behavior after the December 20, 2021 patient complaint evinces a clear effort to flee from the law, and thus further corroborates that I Care's sale of counterfeits was knowing and intentional.

127.   Within days after Janssen discovered the counterfeit SYMTUZA® sold by I Care in late 2021, the pharmacy abruptly closed.  A private investigator hired by Janssen visited

I Care on several occasions in mid-January 2022 and found the pharmacy to be closed with the security gate locked during posted business hours, although, on one occasion, the security case was partially open and the pharmacy was occupied by menacing individuals.

128.    The following week, on January 25, 2022, I Care's pharmacy license was discontinued.

129.    Defendant Edward Gendin is the sole owner of I Care and the corporate address of I Care is a former address of Gendin's in Queens.  As the sole individual known to be associated with I Care, Gendin actively participated in its counterfeiting business.

130.    I Care's principal, Edward Gendin, was deposed on July 7, 2022.  Gendin exercised his Fifth Amendment rights against self-discrimination in response to all questions about I Care's business.  In particular, Gendin took the Fifth when asked whether I Care purchased HIV medication from authorized distributors in order to cover up the fact that it was dispensing counterfeits.

### b.    Brooklyn Chem

131.    Meanwhile, on January 6, 2022—just days after Janssen received the complaint about I Care's counterfeit—Defendant Brooklyn Chem Corp. d/b/a Diamond Star, a different pharmacy located near I Care's corporate headquarters in Queens, registered I Care's name with the New York Division of Corporations as a "doing business as."

132.    On January 28, 2022, just three days after I Care's pharmacy license was discontinued, Brooklyn Chem (using the Diamond Star name) abruptly began purchasing the same high volume of Janssen HIV medication that I Care had been purchasing, from the same distributor.  Around the same time, Brooklyn Chem also purchased I Care's assets at far below market rate.  This evidence suggests that I Care closed down its Manhattan location in response to the counterfeit complaint and transferred its business to Brooklyn Chem.

133.    After the I Care seizure, Brooklyn Chem immediately closed down in an obvious effort to avoid discovery of its illegal activities.

134.    Brooklyn Chem's pattern of abruptly placing large orders for Janssen HIV medication from authorized channels is a telltale sign of a scheme whereby a pharmacy purchases large quantities of HIV medication from authorized distributors that is then sold on the secondary market, while counterfeits obtained inexpensively from low-income individuals are re-dispensed to the pharmacy's patients for full reimbursement by payors.  The record of legitimate purchases then serves as a cover for the counterfeits dispensed to patients.

135.    Defendant Gulyamhusen Azimov is the sole owner of Brooklyn Chem, indicating that he has actively participated in its counterfeiting business.

**c.    Tremont Ave. Defendants**

136.    Third-party discovery in this action has revealed that yet another group of New York City pharmacies, the Tremont Ave. Defendants, was involved in the same distinctive counterfeiting operation as I Care and Brooklyn Chem.

137.    R&A operated a retail pharmacy in the Bronx until about October 2021, which was known as "R&A Drugs."  In early 2022, the same storefront operated as "R&K Drugs" until it closed down in April 2022, shortly after Janssen conducted a seizure at I Care.  Although R&A Drugs and R&K Drugs are different corporate entities, R&A's pharmacy license was transferred to R&K in October 2021 and R&K assumed R&A's retail storefront at or around the same time.  The two corporate entities have plainly been acting in concert with each other as a single business.

138.    The corporate registrations for I Care, R&A, and R&K were filed by Rina Esterov, Esq., who was also responsible for filing the corporate papers I Care, and for at least

two suppliers in the HIV medication trafficking network discovered by Gilead in *Gilead Sciences, Inc. v. Safe Chain Solutions, LLC*, No. 21-cv-4106 (E.D.N.Y. Oct. 14, 2021).

139.    Despite being a pharmacy, R&A sold Janssen-branded HIV medication to Wholesaler Defendant Scripts, further indicating that R&A was involved in the trafficking of counterfeits.

140.    Shortly after the I Care seizure, the Tremont Ave. Defendants abruptly closed their businesses, just like I Care and Brooklyn Chem had done.

141.    As the principal of R&A, Artur Ilaev actively participated in the Tremont Ave. Defendants' counterfeiting business.

142.    As the principal of R&K, Raif Khasiev actively participated in the Tremont Ave. Defendants' counterfeiting business.

**5.      Disclosure of Additional Counterfeiters Through Discovery In This Action**

143.    Through discovery authorized by the Court's expedited discovery order, Janssen has learned substantial new information about the source, distribution, and sale of counterfeit Janssen-branded medication.

**a.      Cina Defendants**

144.    As alleged above, third-party discovery in this action identified Cina as the source of the bottle labeled SYMTUZA® sold at Morris Park Pharmacy in the Bronx that actually contained PREZCOBIX®.  Cina is not an authorized Janssen distributor.

145.    Additional third-party discovery revealed that Cina distributed dozens of packages of prescription medication per day to pharmacies throughout the United States, including to Defendant Ascan and several other pharmacies that had previously purchased counterfeit Janssen HIV medication from the Wholesaler Defendants.  Cina's shipments continued unabated through June 2022.

29

146.    At the end of June 2022, Cina abruptly exited the prescription-drug business and gave away its entire prescription-drug inventory, including Janssen-branded medications, to a relief agency in an apparent effort to escape liability for its wrongdoing.  None of the Janssen-branded products Cina donated to the relief agency had any pedigrees, and several have been confirmed to be counterfeit.

147.    Discovery and seized documents have revealed that Cina purchased Janssen-branded medications, including HIV medications and XARELTO®, INVOKAMET®, and SIMPONI®, from unlicensed suppliers.  Some of Cina's suppliers operated out of private residences and do not appear to have had any office, warehouse, or other business address, or even a website.

148.    Cina purchased Janssen-branded medications from these suppliers for pennies on the dollar.  For example, seized invoices and other documents show that Cina purchased Janssen-branded medications such as SYMTUZA® and PREZISTA® for around 80% less than the Wholesale Acquisition Cost (WAC) of those medications at the time.  These prices are grossly inconsistent with the sale of genuine, legitimately obtained products.  And in fact, none of the Janssen-branded medications that Cina obtained from its suppliers were accompanied by supply-chain pedigrees, which are required by the Drug Supply Chain Security Act in order to guard against counterfeiting.  Cina obtained no documentation or any other assurance that the products obtained at wildly unrealistic prices from unlicensed and disreputable suppliers were genuine.  In response to questions about the suppliers, Cina's principal Tronown Thomas exercised his Fifth Amendment rights against self-incrimination.

149.    Cina sold Janssen-branded medications at marked-up prices that were much closer to the WAC but still discounted, obtaining enormous profit margins.  Bank records

show that this was a highly lucrative business model that yielded tens of millions of dollars in profits for Cina and its principal, Defendant Tronown V. Thomas.  Cina even appears to have purchased the title to a private plane.  Notably, Cina's bank records also show that it transferred millions of dollars out of its accounts between April and July of 2022, after Thomas was indicted.

150.    Since 2016, Tronown V. Thomas has been the principal and director of Cina.  He is currently listed in Texas's corporate database as the president and sole director of Cina.  Thomas also owns ACP Real Estate Holdings LLL ("ACP"), which owns the warehouse and office building where Cina is headquartered in Houston, Texas, and ACP Rayford ("Rayford"), an affiliated pharmaceutical distributor with the same address as Cina.  Thomas had decision-making authority over Cina and Rayford's operations, including their sales and purchases of counterfeit medication, and had a corner office at Cina headquarters.  As the principal and director of Cina and Rayford, Thomas actively participated in their counterfeiting business.

151.    Thomas personally participated in the purchase and sale of counterfeit and infringing Janssen-branded medications, including HIV medications and XARELTO®, INVOKAMET®, and SIMPONI®.  Thomas was directly responsible for negotiating and transacting with suppliers of counterfeit Janssen-branded medications.

152.    When Janssen conducted a seizure at Cina headquarters, Cina employees and Thomas's counsel informed Janssen's counsel that Thomas was the only Cina employee who interacted with Cina's suppliers.  Discovery and seized documents have revealed that Thomas directly and extensively communicated with Cina's suppliers over the phone and by email, and that he made and/or authorized payments to these suppliers.  Moreover, many of the invoices for

Cina's purchases of counterfeit Janssen-branded medication from these suppliers were addressed to Thomas, and some even include what appears to be Thomas's personal email address. Discovery and seized documents have also revealed that Thomas personally signed numerous sales invoices associated with Cina's distribution of Janssen-branded medications to pharmacies across the country. Thomas took the Fifth in response to all questions about these activities.

153.    On April 27, 2022, a criminal indictment was filed in U.S. District Court for the Southern District of Texas charging Thomas and others with Conspiracy to Pay and Receive Healthcare Kickbacks, Healthcare Fraud, and Conspiracy to Launder Money related to a scheme involving Rayford. *See United States v. Thomas*, No. 22-cr-212 (S.D. Tex. Apr. 27, 2022) (D.I. 1). The indictment described a scheme in which Thomas and others paid kickbacks to physicians to fulfill unnecessary prescriptions.

      **b.**      **Cintex Defendants**

154.    Documents produced by Safe Chain indicate that Cintex supplied Safe Chain with over 2,500 bottles of counterfeit Janssen-branded HIV medication.

155.    The supply-chain pedigrees that Janssen has obtained listing Cintex as a supplier to Safe Chain have proven to be counterfeit. Specifically, the pedigrees list sales from McKesson Corporation, an authorized Janssen distributor, to Cintex. But McKesson has confirmed that these sales never occurred. In fact, Cintex have never been a customer of McKesson at all.

156.    Cintex is a fly-by-night operation that fraudulently mimicked the name of a legitimate business in the pharmaceutical industry. Cintex Services LLC is a Georgia-based, Delaware-incorporated maker of generic over-the-counter pharmaceutical products, founded in 2011, that has registered as a business in approximately 35 states ("Cintex Georgia") and appears to be a genuine operating company. In 2021, Cintex (the Defendant in this action) registered an

Illinois unrelated company under the same name, Cintex Services LLC.  Cintex's Illinois address is listed as Cintex's contact address in Safe Chain's business records.  However, Cintex's supply-chain pedigrees list the address of Cintex Georgia.  Cintex Georgia has confirmed, however, that it is completely unrelated to Cintex and has never sold HIV medication.

157.    Cintex's misappropriation of Cintex Georgia's name is consistent with the practice of several other suppliers of counterfeit HIV medication to Safe Chain and other Wholesaler Defendants.

158.    Meanwhile, Cintex's Illinois address is the location of a co-working space where Cintex does not actually conduct any business or have any employees or other business presence.  Rather, FedEx records show that all of Cintex's shipments to Safe Chain were made from drop boxes in Miami, Florida.  This is also consistent with the practices of other suppliers of counterfeit HIV medication to the Wholesaler Defendants.

159.    As the principal of Cintex, Roberto Rodriguez Hernandez actively participated in its counterfeiting business.

**c.    Ascan Defendants**

160.    As alleged above, Ascan sold a bottle of wrong-pill counterfeit SYMTUZA® in November 2020 that it purchased from Scripts.  Recently obtained discovery shows that despite knowing it had purchased a counterfeit from Scripts, Ascan purchased hundreds of additional bottles of counterfeit Janssen-branded HIV medication from the Wholesaler Defendants.  Ascan then dispensed these counterfeits to patients.

161.    In response to a third-party subpoena in this action, Ascan has failed to produce supply-chain pedigrees associated with its purchases from the Wholesaler Defendants.

162.    After the Wholesaler Defendants stopped distributing Janssen HIV medication, Ascan began receiving shipments from Cina starting on September 16, 2021.

Between September 2021 and April 2022, Ascan received 57 shipments from Cina.  It was during this same time that a counterfeit supplied by Cina surfaced at another pharmacy in the Bronx.  To date, Ascan has not provided pedigrees for any of its purchases from Cina.

163.    Ascan continues to dispense Janssen-branded HIV medication of unknown origin to patients that it obtains from Cina and/or other unidentified unauthorized distributors.

164.    As the principal of Ascan, Francis L. Fata actively participated in its counterfeiting business.

**d.    SRX Defendants**

165.    As alleged above, in June 2021 SRX was found to have sold a counterfeit bottle of SYMTUZA® with the wrong pill in the bottle that had been purchased from Safe Chain.  Documents produced by the Wholesaler Defendants show that this counterfeit was just the tip of the iceberg.  SRX ordered over 700 other bottles of counterfeit Janssen-branded HIV medication from Safe Chain and Scripts.  All of these products had counterfeit supply-chain pedigrees.  SRX dispensed these counterfeits to patients.

166.    SRX's purchases from Safe Chain continued through January 2022, long after the counterfeit purchased from Safe Chain was detected and brought to SRX's attention in June 2021.

167.    Janssen has subpoenaed SRX for information about its purchase and dispensing of Janssen-branded HIV medication.  Despite multiple follow-ups, SRX has failed to respond to Janssen's subpoena.

168.    Janssen's business records indicate that SRX has never purchased Janssen-branded HIV medication from authorized distributors.  Thus, SRX is likely actively dispensing to patients Janssen-branded HIV medication of unknown origin obtained from unidentified unauthorized distributors.

34

169.    As the principal of SRX, Aman Deep Singh actively participated in its counterfeiting business.

**e.    Total Remedy**

170.    Total Remedy is, by far, the largest purchaser of Janssen HIV medication from Scripts, Safe Chain, and ProPharma.

171.    According to records produced to Janssen in third-party discovery, Total Remedy has purchased 2469 units of counterfeit Janssen-branded HIV medication, totaling $6,733,814.69, from Safe Chain, Scripts, and ProPharma.  Each of those units was accompanied by a counterfeit pedigree.  Total Remedy dispensed these counterfeits to patients.

172.    Total Remedy continued purchasing counterfeit HIV medication from the Wholesaler Defendants despite receiving warning letters from Gilead indicating that these wholesalers were selling counterfeits.

173.    In response to a subpoena from Janssen, Total Remedy has produced only selected and incomplete information about its purchase and dispensing of Janssen-branded HIV medication.  In particular, it has not disclosed the identities of any unauthorized distributors it has purchased from other than the Wholesaler Defendants.

174.    Currently, Total Remedy is purchasing some Janssen-branded HIV medication from authorized distributors, but only a fraction of the quantities that it previously purchased from the Wholesaler Defendants.  Thus, Total Remedy appears to be actively dispensing to patients Janssen-branded HIV medication of unknown origin obtained from unidentified unauthorized distributors.

175.    As the principal of Total Remedy, Mohammad Etminan actively participated in its counterfeiting business.

35

### f. TLC Xpress

176.    TLC Xpress purchased 301 units of counterfeit Janssen-branded HIV medication from Safe Chain, Scripts, and ProPharma, including purchases as late as January 2022.  Each of these bottles was sold with a counterfeit pedigree.  TLC Xpress dispensed these counterfeits to patients.

177.    TLC and its principal Tran were disciplined by the California Board of Pharmacy for participating in a scheme in 2012 whereby a third-party would offer HIV patients cash and in-kind inducements to transfer their prescriptions for HIV medication to TLC Xpress. The Board ordered a three-year suspension of TLC Xpress's pharmacy license, which was immediately stayed in a stipulated settlement that placed TLC Xpress and Tran on probation for three years beginning in May 2017.

178.    In response to a subpoena from Janssen, TLC Xpress has produced data showing that it continues to dispense large quantities of Janssen-branded HIV medication to patients on a weekly basis.  As of the time of its subpoena response, TLC Xpress had dispensed 81 bottles of such medication to patients from February 2022 to the present.  During that same period, TLC Xpress purchased only 8 bottles of Janssen-branded HIV medication from authorized distributors.  TLC Xpress is actively dispensing to patients Janssen-branded HIV medication of unknown origin obtained from unidentified unauthorized distributors.

179.    As the principal of TLC Xpress, Kevin Nhathuy Quang Tran actively participated in its counterfeiting business.

## D.    COUNTERFEIT HIV AND OTHER MEDICATIONS POSE A SEVERE RISK TO PUBLIC HEALTH

180.    SYMTUZA®, PREZCOBIX®, and PREZISTA® come in thirty-tablet bottles, representing a one-month supply.

36

181.    For patients treating an HIV infection, it is important that the patient take the Janssen medication as prescribed.  If a patient does not take the medication as prescribed, the patient faces the risk that their viral load—*i.e.*, the amount of HIV in their blood—will increase. This viral rebound can have severe consequences: over time, it can weaken the patient's immune system and increase the possibility of infections; it can result in progression of the disease and lead to the development of AIDS; and it can make patients more likely to infect their sexual partners.

182.    HIV is a rapidly mutating virus that can quickly develop permanent resistance to a single antiretroviral agent, or even an entire class of antiretrovirals.  For this reason, the standard of care since the mid-1990s has been to treat HIV with a combination of antiretroviral agents from different classes.

183.    The advent of single-dose tablets has allowed a full combination antiretroviral therapy to be combined into a single tablet, and SYMTUZA® is such a medication. It contains an entire antiretroviral combination therapy in one pill.  But PREZCOBIX®, which has appeared in many confirmed counterfeit bottles of SYMTUZA®, is not.

184.    PREZCOBIX® lacks two of the antiretroviral agents contained in SYMTUZA.  It contains only one class of antiretroviral agent.  Thus, a patient who takes PREZCOBIX® believing it to be SYMTUZA® is receiving an incomplete HIV treatment regimen.  This gap in treatment opens the door for the patient to develop drug resistance, which can persist even after a complete treatment regimen is restored.

185.    In addition to the viral rebound and drug resistance risks, the dispensing of counterfeit medication to patients threatens trust in the healthcare system.  The population living with HIV is diverse.  But many individuals within the population face various psychosocial

37

factors—such as low healthcare literacy, mental health comorbidities, substance abuse, and homelessness—that complicate the patient's relationship with HIV treatment.  As a result, the treatment of HIV requires extensive patient outreach and education to build patient trust.

186.    That fragile trust can be shattered when a patient receives a bottle of the wrong medication.  Indeed, Janssen is aware of at least one patient who did not return to their healthcare provider after receiving a counterfeit HIV medication, and has apparently fallen out of care for their HIV.

187.    These risks created by illegitimate medication may be even greater for the population prescribed one of Janssen's darunavir-based medications (*i.e.*, PREZISTA®, PREZCOBIX®, and SYMTUZA®) than for the general population of patients undergoing HIV treatment.

188.    Darunavir is a protease inhibitor with a particularly high genetic barrier to drug resistance.  This characteristic of darunavir means that it is often prescribed to patients who either have already developed resistance to other antiretroviral agents or are at risk for doing so, based on treatment history or other psychosocial factors.  In other words, a subset of persons living with HIV who are prescribed one of these three Janssen HIV drugs are generally at greater risk for the adverse impacts of viral rebound, drug resistance, and falling out of care due to distrust in the healthcare system.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(A))

189.    Janssen realleges and incorporates by reference paragraphs 1 through 180 of this Complaint as if fully set forth herein.

190.    In violation of 15 U.S.C. § 1114(1)(a), Defendants, independently and in conspiracy with others, used in commerce, without Janssen's consent, either a reproduction, counterfeit, copy or colorable imitation of the Janssen Ireland Marks and Johnson & Johnson Marks in connection with the sale, offering for sale, distribution, or advertising of counterfeit Janssen products; in connection with the sale, offering for sale, distribution, or advertising of Janssen products with altered and/or falsified pedigrees that are materially different from authentic Janssen products authorized for sale by Janssen in the United States and that are not subject to and subvert Janssen's quality-control measures; and in connection with which such use that is likely to cause confusion, or to cause mistake, or to deceive.

191.    Defendants' actions constitute willful infringement of Janssen's exclusive rights in the Janssen Ireland Marks and the Johnson & Johnson Marks.

192.    Defendants are directly, contributorily, and vicariously liable for their infringement.

193.    As a direct and proximate result of Defendants' conduct, Janssen has suffered irreparable harm to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Janssen Ireland Marks and Johnson & Johnson Marks, Janssen will continue to be irreparably harmed.

194.    Janssen has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

195.    As a direct and proximate result of Defendants' conduct, Janssen has suffered damages to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and other damages in an amount to be proved at trial.

39

## SECOND CLAIM FOR RELIEF
## <u>FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(B))</u>

196.    Janssen realleges and incorporates by reference paragraphs 1 through 180 of this Complaint as if fully set forth herein.

197.    In violation of 15 U.S.C. § 1114(1)(b), Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied, or colorably imitated the registered Janssen Ireland Marks and Johnson & Johnson Marks belonging to Janssen and applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the offering for sale, distribution or advertising of counterfeit Janssen products; in connection with the sale, offering for sale, distribution, or advertising of Janssen products with altered and/or falsified pedigrees that are materially different from authentic Janssen products authorized for sale by Janssen in the United States and that are not subject to and subvert Janssen's quality-control measures; and in connection with such use that is likely to cause confusion, to cause mistake, or to deceive.

198.    For example, and without limitation, the Defendants used counterfeit, reproduced, copied, or colorably imitated Janssen Ireland Marks and Johnson & Johnson Marks on the labels of the counterfeit bottles of  Janssen HIV medications they purchased, advertised, and sold, as well as on altered and/or falsified pedigrees for bottles of Janssen HIV medications.

199.     Defendants' actions constitute willful infringement of Jansen's exclusive rights in the Janssen Ireland Marks and Johnson & Johnson Marks.

200.    Defendants are directly, contributorily, and vicariously liable for their infringement.

201.    As a direct and proximate result of Defendants' conduct, Janssen has suffered irreparable harm to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Janssen Ireland Marks and Johnson & Johnson Marks, Janssen will continue to be irreparably harmed.

202.    Janssen has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

203.    As a direct and proximate result of Defendants' conduct, Janssen has suffered damages to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and other damages in an amount to be proved at trial.

### THIRD CLAIM FOR RELIEF
### FALSE DESCRIPTION AND DESIGNATION OF ORIGIN IN COMMERCE

204.    Janssen realleges and incorporates by reference paragraphs 1 through 180 of this Complaint as if fully set forth herein.

205.    In violation of 15 U.S.C. § 1125(a)(1)(A), Defendants, independently and in conspiracy with one another, in connection with the counterfeit Janssen medication, and in connection with Janssen products with altered and/or falsified pedigrees that are materially different from authentic Janssen products authorized for sale by Janssen in the United States, and/or that are not subject to and subvert Janssen's quality-control measures, used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Janssen.

41

206.     Defendants' actions constitute willful infringement of Janssen's exclusive rights in the Janssen Ireland Marks and Johnson & Johnson Marks.

207.     Defendants are directly, contributorily, and vicariously liable for their infringement.

208.     As a direct and proximate result of Defendants' conduct, Janssen has suffered irreparable harm to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Janssen Ireland Marks and Johnson & Johnson Marks, Janssen will continue to be irreparably harmed.

209.     Janssen has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

210.     As a direct and proximate result of Defendants' conduct, Janssen has suffered damages to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and other damages in an amount to be proved at trial.

**FOURTH CLAIM FOR RELIEF**
**FEDERAL FALSE ADVERTISING**

211.     Janssen realleges and incorporates by reference paragraphs 1 through 180 of this Complaint as if fully set forth herein.

212.     In violation of 15 U.S.C. § 1125(a)(1)(B), Defendants, independently and in conspiracy with one another, in connection with the sale of counterfeit Janssen medication, and in connection with the sale of  Janssen products with altered and/or falsified pedigrees that are materially different from authentic Janssen products authorized for sale by Janssen in the United States and that are not subject to and subvert Janssen's quality-control measures, used a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false

42

designation of origin, false or misleading description of fact, or false or misleading

representation of fact, which in commercial advertising or promotion, misrepresents the nature,

characteristics, and qualities of the counterfeit Janssen medication.

213.    Defendants advertised, marketed, and promoted the counterfeit Janssen

products, and the materially different Janssen products with altered and/or falsified pedigrees, to

the public, and/or to specific segments of the public, using the Janssen Ireland Marks and

Johnson & Johnson Marks, as well as other intellectual property belonging to Janssen.

214.    Defendants' actions constitute willful infringement of Janssen's exclusive

rights in the Janssen Ireland Marks and Johnson & Johnson Marks.

215.    Defendants are directly, contributorily, and vicariously liable for their

infringement.

216.    As a direct and proximate result of Defendants' conduct, Janssen has

suffered irreparable harm to the valuable Janssen Ireland Marks and Johnson & Johnson Marks

and their reputation in the industry.  Unless Defendants' conduct is restrained, Janssen will

continue to be irreparably harmed.

217.    Janssen has no adequate remedy at law that will compensate for the

continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

218.    As a direct and proximate result of Defendants' conduct, Janssen has

suffered damages to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and other

damages in an amount to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**FEDERAL DILUTION OF MARK**

219.    Janssen realleges and incorporates by reference paragraphs 1 through 180

of this Complaint as if fully set forth herein.

43

220.    The Janssen Ireland Marks and Johnson & Johnson Marks are famous and distinctive within the meaning of 15 U.S.C. § 1125(c).

221.    Defendants are selling and/or have sold counterfeit, altered, and/or falsified products bearing the Janssen Ireland Marks and Johnson & Johnson Marks after such trademarks and trade dress became famous.

222.    By selling these products, Defendants, independently and in conspiracy with one another, have diluted and are diluting the distinctive quality of a mark or trade name owned by Janssen in violation of 15 U.S.C. § 1125(c).

223.    Defendants' actions constitute willful infringement of Jansen's exclusive rights in the Janssen Ireland Marks and Johnson & Johnson Marks.

224.    Defendants are directly, contributorily, and vicariously liable for their infringement.

225.    As a direct and proximate result of Defendants' conduct, Janssen has suffered irreparable harm to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and their reputation in the industry.  Unless Defendants' conduct is restrained, Janssen will continue to be irreparably harmed.

226.    Janssen has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

227.    As a direct and proximate result of Defendants' conduct, Janssen has suffered damages to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and other damages in an amount to be proved at trial.

### SIXTH CLAIM FOR RELIEF
### NEW YORK DILUTION OF MARK AND INJURY TO BUSINESS REPUTATION

228.    Janssen realleges and incorporates by reference paragraphs 1 through 180

of this Complaint as if fully set forth herein.

229.    All of the Janssen Ireland Marks and Johnson & Johnson Marks are individually distinctive under New York General Business Law § 360-1.

230.    By selling counterfeit, altered, and/or falsified products bearing the Janssen Marks and Trade Dress, Defendants, independently and in conspiracy with one another, have injured and are continuing to injure Janssen's business reputation and/or have diluted and are continuing to dilute the distinctive quality of a mark or trade name owned by Janssen, in violation of New York General Business Law § 360-1.

231.    As a direct and proximate result of Defendants' conduct, Janssen has suffered irreparable harm to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and their reputation in the industry.  Unless Defendants' conduct is restrained, Janssen will continue to be irreparably harmed.

232.    Janssen has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

233.    As a direct and proximate result of Defendants' conduct, Janssen has suffered damages to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and other damages in an amount to be proved at trial.

**SEVENTH CLAIM FOR RELIEF**
**NEW YORK DECEPTIVE BUSINESS PRACTICES**

234.    Janssen realleges and incorporates by reference paragraphs 1 through 180 of this Complaint as if fully set forth herein.

235.    In violation of New York General Business Law § 349, Defendants, independently and in conspiracy with one another, are selling, offering for sale, and/or

distributing counterfeit, altered, and/or falsified products unlawfully bearing the Janssen Ireland Marks and Johnson & Johnson Marks.

236.     As a direct and proximate result of Defendants' deceptive conduct, Janssen has suffered irreparable harm to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Janssen Ireland Marks and Johnson & Johnson Marks, Janssen will continue to be irreparably harmed.

237.     Janssen has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

**EIGHTH CLAIM FOR RELIEF**
**COMMON-LAW UNFAIR COMPETITION**

238.     Janssen realleges and incorporates by reference paragraphs 1 through 180 of this Complaint as if fully set forth herein.

239.     In violation of the common law of the State of New York and elsewhere, Defendants, independently and in conspiracy with one another, have unfairly competed with Janssen by selling the counterfeit, altered, and/or falsified products.

240.     As a direct and proximate result of Defendants' unfair competition, Janssen has suffered irreparable harm to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and their reputation in the industry.  Unless Defendants' conduct is restrained, Janssen will continue to be irreparably harmed.

241.     Janssen has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

242.     As a direct and proximate result of Defendants' unfair competition, Janssen has suffered damages to the valuable Janssen Ireland Marks and Johnson & Johnson Marks and other damages in an amount to be proved at trial.

### NINTH CLAIM FOR RELIEF
### COMMON-LAW UNJUST ENRICHMENT

243.     Janssen realleges and incorporates by reference paragraphs 1 through 180 of this Complaint as if fully set forth herein.

244.     By selling the counterfeit, altered, and/or falsified products bearing Janssen's valuable trademarks independently and in conspiracy with one another, Defendants have been unjustly enriched at Janssen's expense in violation of the common law of New York and elsewhere.

245.     Under principles of equity, Janssen is entitled to restitution and/or disgorgement of Defendants' ill-gotten gains.

### PRAYER FOR RELIEF

WHEREFORE, Jansen demands judgment against Defendants as follows:

A.     preliminarily and permanently enjoining, each and every one of the Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them:

(i)     from selling any Janssen medication, whether genuine or counterfeit;

(ii)     from using any of the Janssen Ireland Marks and Johnson & Johnson Marks or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of medication;

14053344

(iii)    from using any logo, trade name, or trademark confusingly similar

to any of the Janssen Ireland Marks and Johnson & Johnson

Marks, which may be calculated to falsely represent or which has

the effect of falsely representing that the services or products of

Defendants or of others are sponsored by, authorized by, or in any

way associated with Janssen;

(iv)    from directly, contributorily, and vicariously infringing any of the

Janssen Ireland Marks and Johnson & Johnson Marks;

(v)    from otherwise unfairly competing with Janssen in the

manufacture, sale, offering for sale, distribution, advertisement, or

any other use of Janssen medications;

(vi)    from falsely representing themselves as being connected with

Janssen or sponsored by or associated with Janssen or engaging in

any act which is likely to cause the trade, retailers, and/or members

of the purchasing public to believe that Defendants, or any of

them, are associated with Janssen;

(vii)    from using any reproduction, counterfeit, copy, or colorable

imitation of any of the Janssen Ireland Marks and Johnson &

Johnson Marks in connection with the publicity, promotion, sale,

or advertising of medications;

(viii)    from affixing, applying, annexing or using in connection with the

sale of any goods, a false description or representation including

words or other symbols tending to falsely describe or represent

48

such goods as being authentic Janssen medication and from

offering such goods in commerce;

(ix)    from diluting the Janssen Ireland Marks and Johnson & Johnson

Marks;

(x)    from destroying any records documenting the manufacture, sale,

offer for sale, distribution, advertisement, or receipt of any product

purporting to be Janssen medication; and

(xi)    from assisting, aiding, or abetting any other person or business

entity in engaging in or performing any of the activities referred to

in subparagraphs (i) through (x) above; and

B.    ordering that, within fifteen days after the entry and service of a preliminary or permanent injunction, Defendants serve and file a written report under oath setting forth in detail the manner and form in which they have complied with the injunction; and

C.    ordering that all infringing material be turned over, seized, impounded, and/or destroyed; and

D.    awarding to Janssen punitive damages from each Defendant in an amount to be ascertained at trial, but in no event less than $25 million; and

E.    awarding to Janssen statutory, actual damages, or threefold damages in an amount to be ascertained at trial, and costs and attorney's fees; and

F.    awarding to Janssen an accounting, and an award of: (i) disgorgement of all ill-gotten profits from Defendants' manufacture, sale, and/or distribution of the counterfeit medication; (ii) Janssen's lost profits; and (iii) Janssen's remedial costs; and

G.      awarding Janssen restitution and/or a constructive trust for Defendants' unjust enrichment; and

H.      awarding to Janssen pre-judgment and post-judgment interest; and

I.      awarding such other and further relief to Janssen as may be just, proper, and equitable.

Dated:  December 20, 2022

Respectfully submitted,

_____
Geoffrey Potter
Aron Fischer
A. Robert Quirk
Andrew I. Haddad
Megha Hoon

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Tel:     (212) 336-2000
Fax:     (212) 336-2222
gpotter@pbwt.com
afischer@pbwt.com
rquirk@pbwt.com
ahaddad@pbwt.com
mhoon@pbwt.com

*Attorneys for Plaintiffs Janssen Sciences Ireland Unlimited Company, Janssen Products, LP, and Johnson & Johnson*

14053344